## STATEMENT OF FACTS

## INTRODUCTION

I.  The Defendant Corporations and the Principal Co-Conspirators

1.  Defendant LAFARGE S.A. ("LAFARGE") was the parent company of multinational building materials subsidiary businesses and was organized under the laws of France and headquartered in Paris, France. LAFARGE, together with its direct and indirect subsidiaries, employed 63,000 people to manufacture and sell cement, construction aggregates, concrete and other building materials at 1,612 production sites in approximately 61 countries. On July 10, 2015, after the offense conduct described herein had ended, LAFARGE was acquired by its leading competitor, Holcim Ltd. ("Holcim"), a Zurich, Switzerland-based multinational building materials business. LAFARGE thereafter became a wholly owned subsidiary of Holcim.

2.  Defendant LAFARGE CEMENT SYRIA S.A. ("LCS") was an indirect subsidiary of LAFARGE organized under the laws of Syria and headquartered in Damascus, Syria. LAFARGE indirectly owned approximately 98.7% of LCS's issued and outstanding share capital through four separate subsidiaries. From approximately May 2010 to September 2014, LAFARGE, through LCS, operated a cement plant in the Jalabiyeh region of Syria, located in Northern Syria near the Turkish border and between the cities of Manbij and Raqqah, Syria (the "Jalabiyeh Cement Plant").

3.  Executive 1 was a citizen and national of France and was Vice President of Security for LAFARGE from approximately October 2008 until September 2017. He was based at LAFARGE's headquarters in Paris, France. Executive 1 was also a member of LAFARGE's Security Committee.

4. Executive 2 was a citizen and national of France and was an Executive Vice President of Operations of LAFARGE from approximately January 2012 to December 2015. As Executive Vice President of Operations, Executive 2 supervised LAFARGE's operating subsidiaries in numerous countries, including LCS's operations in Syria. He was based at LAFARGE's headquarters in Paris, France and reported directly to Executive 6. Executive 2 was also a member of LAFARGE's Security Committee, and beginning on July 4, 2013, served as Chairman of the Board of Directors of LCS.

5. Executive 3 was a citizen and national of France and was CEO of LCS from approximately 2008 to July 2014. While CEO of LCS, Executive 3 was based at LCS's headquarters in Damascus, Syria before relocating to Cairo, Egypt in 2012, and reported directly to Executive 2.

6. Executive 4 was a citizen and national of France who became CEO of LCS in approximately July 2014 and remained in that role until approximately January 2016. Executive 4 was based in Amman, Jordan and reported directly to Executive 2 until Executive 2 left LAFARGE.

7. Executive 5 was a citizen of the United States and of France, and was an Executive Vice President of LAFARGE until January 2016. Executive 5 was also a member of LAFARGE's Security Committee, and member of the Board of Directors of LCS until January 2016 and its Chairman from 2008 until July 4, 2013. He was based at LAFARGE's headquarters in Paris, France and reported directly to Executive 6.

8. Executive 6 was a citizen and national of France and was Chairman of the Board of Directors and Chief Executive Officer of LAFARGE until the completion of the acquisition by Holcim in 2015. He was based at LAFARGE's headquarters in Paris, France.

9. Intermediary 1 was a citizen and national of Syria and a minority shareholder in LCS until the Syrian government first seized and later confiscated his shares in LCS in approximately 2012. Intermediary 1 was paid by LCS, with LAFARGE's knowledge and approval, to provide "security" services for LCS, which included negotiating with various local armed militants, ultimately including the Islamic State of Iraq and al-Sham ("ISIS") and the al-Nusrah Front ("ANF").

10. Intermediary 2 was a citizen of Canada and of Syria and a former consultant to LCS who held himself out as a broker capable of sourcing raw materials from ISIS-controlled territories.

11. In-House Lawyer 1 was a citizen of France and was Regional Senior Counsel for Africa & Middle East for LAFARGE based in its Paris, France headquarters from approximately January 2009 to August 2015. He was responsible for advising Executive 2, Executive 3, and, later, Executive 4 regarding LCS's operations in Syria.

II. The Foreign Terrorist Organizations

A. ISIS

12. On or about October 15, 2004, the United States Secretary of State designated al-Qaeda in Iraq ("AQI"), then known as Jam'at al Tawhid Wa'al-Jihad, as a Foreign Terrorist Organization ("FTO") under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist entity under section 1(b) of Executive order 13224. On or about May 15, 2014, the Secretary of State amended the designation of AQI as an FTO under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist entity under section 1(b) of Executive Order 13224 to add the alias Islamic State of Iraq and the Levant ("ISIL") as its primary name. The Secretary of State also added the following aliases to the FTO listing: The Islamic State of Iraq and al-Sham ("ISIS," which is how the FTO will be referenced herein),

The Islamic State of Iraq and Syria, ad-Dawla al-Islamiyya fi al-Iraq wa-sh-Sham, Daesh, Dawla al Islamiya, and Al-Furquan Establishment for Media Production. On September 21, 2015, the Secretary added the following aliases to the FTO listing: Islamic State, ISIL and ISIS. To date, ISIS has remained a designated FTO. ISIS has claimed credit for numerous terrorist activities.

B.    <u>Al-Nusrah Front</u>

13.    On December 11, 2012, the Secretary of State amended the 2004 designation of AQI to include the following aliases: al-Nusrah Front ("ANF"), Jabhat al-Nusrah, Jabhet al-Nusra, The Victory Front, and Al-Nusrah Front for the People of the Levant.

14.    On May 15, 2014, the Secretary of State, in response to the evolving nature of the relationship between ANF and AQI, amended the FTO designation of AQI to remove all aliases associated with al-Nusrah Front. Separately, the Secretary of State then designated al-Nusrah Front, also known as Jabhat al-Nusrah, Jabhet al-Nusra, The Victory Front, Al-Nusrah Front for the People of the Levant, Al-Nusrah Front in Lebanon, Support Front for the People of the Levant, and Jabaht al-Nusra li-Ahl al-Sham min Mujahedi al-Sham fi Sahat al-Jihad, as an FTO under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist entity under section 1(b) of Executive Order 13224. To date, ANF has remained a designated FTO.

SUMMARY OF THE OFFENSE

15.    In or about 2011, after a civil war began in Syria, LCS, with the knowledge and approval of LAFARGE, conspired to engage in transactions, through intermediaries, with numerous armed factions present in the region of the Jalabiyeh Cement Plant, ultimately including the U.S.-designated foreign terrorist organizations ISIS and ANF. While other multinational corporations withdrew from and ceased operations in Syria, LAFARGE and LCS executives, through intermediaries, negotiated agreements to pay these armed groups to protect LCS

4

employees, to ensure continued operation of the Jalabiyeh Cement Plant, and to obtain economic advantage over their competitors in the Syrian cement market. LAFARGE and LCS executives conspired to make periodic security payments to armed groups, including ISIS and ANF, and to purchase raw materials from ISIS-controlled suppliers who paid ISIS based on the amount of their sales to LCS. Moreover, for the explicit purpose of incentivizing ISIS to act in a manner that would promote LAFARGE's and LCS's security and economic interests, LAFARGE and LCS conspired to make payments to ISIS based on the volume of cement that LCS sold—effectively a revenue-sharing agreement that LAFARGE and LCS executives likened to paying "taxes" to ISIS. In exchange, ISIS permitted access to raw materials sourced from territory under its control so that the Jalabiyeh Cement Plant could continue to produce cement, and further allowed LCS employees, suppliers and customer-distributors to safely pass through ISIS and ANF checkpoints on the roads leading to the Jalabiyeh Cement Plant. ISIS also agreed to impose costs on, and in some cases block the importation of, competing cement from Turkey. Had LAFARGE and LCS refused to deal with ISIS and ANF, LCS would not have been able to acquire the raw materials needed to operate the Jalabiyeh Cement Plant and produce cement, and ISIS and ANF would have used force and threats of force to prevent LCS's employees and customers from traveling there to do their jobs and purchase the cement that LCS had produced.

16. LCS engaged in this conduct at the direction of LAFARGE's and LCS's senior management, including Executive 1, Executive 2, Executive 3 and Executive 4, for the specific purpose of protecting LAFARGE's and LCS's employees, assets, and future economic opportunities in Syria. As Executive 3 later wrote in an August 27, 2017 response to his August 25, 2017, termination from LAFARGE, "All the local concessions that I had to make to this end were made with the clear and repeated approval of my hierarchy, regarding the details as well as

5

the principle." Executive 3 added, "Nothing I did was unknown to my hierarchy who methodically approved my initiatives, including all the details, and was satisfied about them."[1]

17. LAFARGE and LCS completed the construction of the Jalabiyeh Cement Plant in 2010 at a cost of approximately $680 million. LAFARGE and LCS executives believed that keeping the Jalabiyeh Cement Plant in business and sharing the proceeds with the armed groups in control of the surrounding areas, including ISIS and ANF, was the best way to protect employees, to safeguard the asset from looting and destruction during the Syrian Civil War, and to enable LAFARGE and LCS to benefit from the economic opportunity presented by the need to rebuild Syria following the cessation of hostilities. Neither LAFARGE nor LCS made payments to ISIS or ANF because they supported the terrorist organizations' ideology or methods.

18. LAFARGE and LCS executives actively attempted to conceal their conduct from others within and outside LAFARGE and LCS, including by using third-party intermediaries to carry out negotiations and effect these agreements with ISIS, and by attempting to require ISIS not to include the name "Lafarge" on the documents memorializing and implementing their agreements. Many of the LAFARGE and LCS executives involved in the offense conduct also used personal email accounts serviced by U.S.-based email service providers, instead of their LAFARGE corporate email addresses, to carry out some aspects of the conspiracy. LAFARGE and LCS executives also created invoices with false descriptions for the third-party intermediaries they used to negotiate with ISIS, in order to conceal the nature of the work that the intermediaries had performed for LAFARGE and LCS, and to allow LAFARGE and LCS to later falsely deny knowledge of their activities.

---

[1] All citations to documents originally in English contain original spelling, punctuation, and grammar. Citations to documents originally in French are based on translations.

19. From in or around August 2013, or earlier, through October 2014, LAFARGE and LCS conspired to make various payments, through intermediaries, to and for the benefit of ISIS and ANF, which the government estimates totaled the equivalent of approximately $5.92 million. These payments consisted, at various times, of flat monthly "donation" payments totaling approximately $816,000, payments to ISIS-controlled suppliers to purchase raw materials needed to produce cement that totaled approximately $3,447,528, and variable payments based on the amount of cement LCS sold that totaled approximately $1,654,466. When LCS eventually evacuated the Jalabiyeh Cement Plant in September 2014, ISIS stole cement that LCS had produced in furtherance of the conspiracy, and ISIS sold the cement at prices that would have yielded ISIS approximately $3.21 million. In addition, LAFARGE and LCS conspired to pay the equivalent of approximately $1,113,324 to third-party intermediaries for negotiating with and making payments to ISIS and ANF on LAFARGE's and LCS's behalf.

20. The government estimates that during the time period from August 2013 to October 2014, LCS obtained the equivalent of approximately $70,295,820 in total sales revenue through its participation in the conspiracy, and the gross gains to all participants in the conspiracy, including LCS, the intermediaries, ISIS and ANF, totaled approximately $80,541,890.

## THE SCHEME TO PROVIDE MATERIAL SUPPORT TO FOREIGN TERRORIST ORGANIZATIONS

I. LAFARGE and LCS Use Intermediaries to Begin Negotiations with Armed Groups

21. LAFARGE and LCS constructed the Jalabiyeh Cement Plant in northern Syria at a cost of approximately $680 million. Through LCS, LAFARGE began manufacturing cement at the Jalabiyeh Cement Plant in May 2010. From the beginning of LCS's operations, it faced strong competition from cheaper cement imported into northern Syria from Turkey, and in December

2010, Executive 3 sought the assistance of Intermediary 1 to intervene with the Syrian government to control the importation of competing Turkish cement.

22. In or around 2011, the combination of civil protests in Syria and the Syrian government's violent suppression of those protests developed into a full-fledged civil war, which remains ongoing. In or about September 2011, the European Union ("EU") imposed an embargo on Syrian petroleum products to further isolate and weaken the Syrian regime in response to its brutal crackdown on opposition groups within the country. Under the new sanctions, all 27 EU member states were barred from buying, importing or transporting oil and other petroleum products from Syria, and from entering into financial or insurance services for such transactions. On or about December 1, 2011, the United Nations Office of the High Commissioner for Human Rights declared that Syria was in a state of civil war.

23. In 2012, ISIS and ANF gained control of territory in Syria and committed numerous terrorist acts, resulting in the deaths of numerous U.S. citizens, among others.

24. The EU sanctions and U.N.'s recognition of the Syrian civil war were followed by an exodus of multinational corporations from Syria. For example, on December 2, 2011, a Dutch petroleum conglomerate announced that it was pulling out from Syria in response to the sanctions. Three days later, one of the world's largest oil companies, headquartered in France, announced that it was halting operations in Syria due to, among other factors, safety concerns. Other international corporations quickly followed suit.

25. By contrast, LAFARGE and LCS executives took action to preserve ongoing operations at the Jalabiyeh Cement Plant. By May 2012, the conflict had spread to areas immediately surrounding the Jalabiyeh Cement Plant. Some LCS employees were kidnapped for ransom, one LCS contractor was killed at a checkpoint, and armed militants began to regularly

hijack LCS trucks. LAFARGE and LCS executives were aware of the risks of violence to their personnel and suppliers. In a June 1, 2012 email, Executive 1 wrote, "Both the threat level together with the volatility of the situation have led [Executive 2 and Executive 3] to make the decision to diminish our exposure and more specifically of the expatriates population who can become targets. What is expected is to procede to an orderly evacuation of the expatriate employees, but ensuring the physical protection of the assets and equipment being mothballed at every step."[2] Thus, in June 2012, LCS's European employees were evacuated from the country, and LCS's non-Syrian management relocated from its headquarters in Damascus, Syria, to the offices of a Lafarge Group company in Cairo, Egypt. LCS's Syrian employees, however, continued to operate the Jalabiyeh Cement Plant under the direction of LCS's management from Cairo.

26. Starting in the summer of 2012, LAFARGE and LCS executives, through intermediaries, began to negotiate with various armed factions in the Syrian civil war to permit continued operations of the Jalabiyeh Cement Plant. On September 23, 2012, Executive 1 and Intermediary 1 met in Gaziantep, Turkey with representatives of armed militants in areas surrounding the plant. Thereafter, Intermediary 1 recommended to Executive 1 and Executive 3 that LCS make payments to each of the armed groups based on the quantity of cement produced at the plant or according to a monthly fee.

27. By November 2012, ANF's presence in the region surrounding the Jalabiyeh Cement Plant grew, and LAFARGE and LCS executives approved a plan to establish relations with ANF through Intermediary 1. On November 11, 2012, Intermediary 1 notified Executive 3 that LCS was engaging directly with ANF: "gazi entab [Gaziantep, Turkey] was good we hav now conextion with jabhat al nosra [ANF]." LAFARGE and LCS executives were aware that the

---

[2]    All citations to written correspondence include original spelling, punctuation and grammar.

United States government had designated ANF as a foreign terrorist organization. In a December 20, 2012 email, Executive 1 wrote, "The Islamist group Jabhat Al-Nusra, which is on USA's list of terrorist organisations, has reportedly recruited several Norwegian citizens to fight in Syria." Similarly, in a March 1, 2013 email to Executive 1 and Executive 3, LCS's risk manager warned that ANF "follow[s] a global jihadi ideology (similar to al-Qaida) and are more open to receive foreign fighters" and had "ties to al-Qaeda, exemplified by participating al-Qaida veterans, mainly from Iraq, and . . . some of their statements are quickly published in the main al-Qaida news outlet."

II.     LAFARGE and LCS Begin Making Payments to Terrorists

28.     In a May 2013 report to Executive 2 referring to the PYD,[3] Executive 3 explained that "[o]ur opinion" is to pursue the following option:

> [T]ry to continue to operate the plant as long as possible, providing there is no physical incident to our employees or contractors. This is aiming at preserving the integrity of our physical assets (avoiding the plant to be looted), keeping our personnel ready for the end of the crisis (knowing the huge investment we have made in terms of recruitment and competency development), staying in the market (to keep our distributors' network and to prevent to let Turkish imports flooding North and East of Syria), making some profit to at least repay the interests of the loan and giving some assurance to the lenders.

And Executive 3 recommended that:

> we implement this option trying to cope with the presence of PYD, resisting to their pressure as much and as long as possible, but giving up when necessary providing it does not jeopardize the future and Lafarge values.

29.     LAFARGE and LCS pursued this course of action even as ISIS's and ANF's influence in the areas surrounding and serviced by the Jalabiyeh Cement Plant began to grow. By March 2013, the city of Raqqah, located less than a two-hour drive from the Jalabiyeh Cement Plant, had fallen to ISIS and ANF, among other armed groups. Both jihadist groups quickly

---

[3]     "PYD" refers to the Democratic Union Party in Syria, an armed faction in the Syrian Civil War.

established armed checkpoints at roads accessing the Jalabiyeh Cement Plant. Shortly thereafter, on or about April 7, 2013, Intermediary 1 recommended that LCS executives negotiate an agreement to pay ANF monthly or by the truck to ensure continued access to the plant. On or about June 25, 2013, LCS's risk manager wrote to Executive 1 and Executive 3 reporting that ISIS was gathering strength near the Jalabiyeh Cement Plant. In an email on or about July 24, 2013, LCS's risk manager warned Executive 1 and Executive 3 that ISIS and ANF had erected checkpoints at the "Sarreen intersection" an approximately 30-minute drive from the Jalabiyeh Cement Plant, "and at the grain silos," with snipers on the silos, as well as homemade artillery and rockets.

30. In an August 30, 2013 email from Executive 3 to Executive 1 and Executive 2, Executive 3 reported: "It is clear that we have an issue with ISIS and Al Nusra and we have asked our partner [Intermediary 1] to work on it."

31. LAFARGE and LCS executives identified the "main challenge" related to the presence of ISIS and ANF, among other armed groups, in notes of a September 11, 2013 meeting of LAFARGE's Security Committee received by Executive 1 and Executive 2: "It gets harder and harder to operate without having to directly or indirectly negotiate with networks classified as terrorists by international organizations and the US. The main challenge being to assess how far their demands and threats will reach, and consequently, the limits that we want to impose for the site to operate."

32. LAFARGE and LCS executives took measures to ensure that documents regarding payments to FTOs and other armed groups did not reference the word "Lafarge." For example, on or about September 16, 2013, Executive 3 wrote Intermediary 1 concerning an agreement with an armed militia to issue vehicle passes allowing LCS employees, suppliers, and customer-

11

distributors to pass checkpoints west of the Jalabiyeh Cement Plant that referred to "Lafarge," and instructed Intermediary 1 that "the name of Lafarge should never appear for obvious reasons in any document of this nature. Please use the words Cement Plant if you need but never the one of Lafarge."

33. By the summer of 2013, LAFARGE and LCS could not continue to operate in Syria without negotiating and ultimately making payments to ISIS, ANF and other armed militants. For example, minutes from a Security Committee meeting held in Paris in September 2013, indicate that "logistics flows and staff movements are disrupted, even sometimes blocked . . . by ISIS . . . [which] demand[s] that 'a tax be paid' . . . [Executive 3 and an LCS employee] have been 'summoned' in front of the Islamic Court of Raqqa by ISIS in order to answer the charges filed against them: cooperation with the Syrian regime, vandalism against the roads, ethnic favoritism . . . The presence of these Islamist groups is for us the main threat." Despite recognizing the danger, LAFARGE and LCS continued to operate in Syria.

34. Initially, once passage agreements were reached in October of 2013, payments began as a flat $150 fee per cement truck, but soon evolved into payments based on the quantity of cement that LCS sold. To ensure that LAFARGE and LCS employees did not make the payments directly to ISIS and ANF, LAFARGE and LCS agreed to discount the price of the cement sold to their customer-distributors to reimburse them for making the payments to ISIS and ANF themselves. Through Intermediary 1, LAFARGE and LCS agreed to regularly provide ISIS with details regarding the amount of cement sold to each of their customer-distributors so that ISIS could ensure that they had paid the agreed-upon amount.

35. For example, on or about September 1, 2013, Executive 3 emailed Intermediary 1 an internal LCS email detailing the seizure of two trucks from an LCS customer-distributor at a

checkpoint to the east of the Jalabiyeh Cement Plant. Executive 3 asked, "Can you update me of any progress in your discussions to let trucks (cement as well as raw materials) arriving and leaving on the east side of the plant?" Intermediary 1 replied the next day that his associate had made a call and had been told "that the Truck Sponsors will solve this problem / The Road Situation is better now Al Nusra do not obstruct Lafarge trucks ever as long as we pay them for Saryeen." And, on or about October 14, 2013, an LCS risk manager reported to Executive 1 that "our customer has reached long term agreements with leading groups Islamic State in Iraq and al-Sham (ISIS) in Raqqa, the agreement let the trucks coming back and forth from the east side of the plant. Each cement truck has to pay 150$."

36.     One agreement obtained by the government from weeks later, however, reflects that LCS agreed to pay ISIS based on the amount of cement that it sold. This agreement, dated November 6, 2013 and on ISIS letterhead, was between ISIS and LCS. It provided that ISIS would assess trucks 400 Syrian pounds[4] for each transported ton of cement and, in exchange, ISIS would ensure the safety and free access of the trucks to the cement plant. Relatedly, an ISIS vehicle pass dated April 26, 2014, and bearing ISIS's letterhead and stamp, allowed LCS employees "to pass through after the required work. This is after they have fulfilled their dues to us.":

---

[4] At this time, the exchange rate of Syrian pounds to U.S. dollars was approximately 112 to 1.



37.     LCS also made fixed monthly "donation" payments through Intermediary 1 to ANF, ISIS and other armed groups with influence over the areas surrounding the Jalabiyeh Cement Plant.

38.     LCS began to make fixed monthly payments to armed groups through Intermediary 1 as early as July 2012.  By February 2013, at Executive 3's request, Intermediary 1 had begun periodically providing lists to Executive 3 identifying the armed groups to which he was making payments on LCS's behalf and the amounts he was paying to the groups each month.  Initially, the lists that Intermediary 1 provided anonymized the armed groups he was paying and identified them only by their location, and not by the name of the group.  Beginning in February 2013 and

14

continuing through at least July 31, 2013, Intermediary 1 advised Executive 3 that he was making payments of first 200,000 Syrian Pounds, and later 325,000 Syrian Pounds, per month to a group he identified as the "ALRAQA People," referring to the Syrian city located to the southeast of the Jalabiyeh Cement Plant. The government's investigation indicates that the "ALRAQA People" at this time referred to ANF. Intermediary 1 did not explicitly identify the "ALRAQA People" as ANF in his correspondence with Executive 3, and Executive 3 did not press Intermediary 1 to identify the group, even after Raqqah fell to an assortment of armed groups in an assault led by ANF and another armed faction, Ahrar al-Sham, in early March 2013.

39.     Not until the summer of 2013, when ISIS began to seize control of Raqqah from ANF and other rebel factions operating from the city, did LCS executives press Intermediary 1 to more specifically identify the recipients of the payments he made to armed groups on LCS's behalf. On or about July 1, 2013, Executive 3 sent Intermediary 1 an email in which he requested "an updated list from the one given in Dubai as we need to better understand some items like 'Bridge check point' or 'Al Raqah people'. To which faction do they belong to ?" In reply, Intermediary 1 provided information identifying some of the armed factions, but not the "Al Raqqah People." In a follow-up email on or about July 2, 2013, with the subject line "Donations," Executive 3 calculated that the new total of monthly payments to armed factions was 17.4 million Syrian Pounds, and he reiterated his request for information about the identities of the armed factions that LCS was paying through Intermediary 1:

> I have updated in bold characters the list with the clarifications you sent in your memo and the modifications we agreed yesterday.
>
> Can you clarify who are the people of "Euphrates bridge check point" and which check point for "Syrian army check point"? Who are the people in Tal Abyad and Raqah ?

> I understand that you are dealing with a lot of different people and I have no problem with that but, as the amount has jumped from 7.6 in May to 14.3 in June and 17.4 in July, it is not abnormal to have some clarifications

In reply, Intermediary 1 advised that he would send Executive 3 "this evening a complete but more complicated list of this," but he did not identify the "Al Raqqah people" in his correspondence with Executive 3.

40. On or about August 5, 2013, Executive 3 emailed Executive 2 with the subject line "Update on donations" reflecting "some elements on the donations we are paying to [Intermediary 1] and that he is supposed to channel to the various beneficiaries. As discussed in Dubai end of May and as reminded in my recent mail to you and [Executive 5], these donations are distinct from the monthly remuneration of our partner." The email included a "List valid up to July 31, 2013" with the "Al Raqqah people" but the group, together with others, had been removed from the "List valid from August 1, 2013," which included the "PYD," "FSA and Revolutionary councils Menbij," "Tal Abyad area," "FSA and Revolutionary coucils Aleppo," and "Ahrar al Cham brigade."[5] At this time, the revolutionary councils in Manbij and Aleppo were loosely organized umbrella groups seeking to coordinate the actions of different armed factions against the Syrian regime and consisted of numerous different groups, including armed Islamist groups.

41. LCS's decision to cease payments to the "Al Raqqah people" while paying the local revolutionary council in Manbij permitted LCS to sell cement on the west side of the Jalabiyeh Cement Plant, but closed its access to customers and suppliers in the areas to the south and east of the plant. On August 24, 2013, Executive 3 forwarded to Executive 1 and Executive 2 an email chain and attachments with a report that he was "seeing an improvement of the situation on the

---

[5] "Ahrar al Cham brigade" refers to Ahrar al-Sham, a coalition of multiple groups of Islamist militants who fought together during the Syrian Civil War and which was, at times, allied with ANF.

west of the plant (towards Menbij and Aleppo) as per my email below." The email that Executive 3 forwarded was sent by Executive 3 to Intermediary 1, Executive 1 and LCS's risk manager, and attached an Arabic-language document dated August 21, 2013, from the "Chairman of the military coincil in Menbej and its country side" on behalf of "The Local Revolutionary Council in Menbej city and its countryside" "To Al Mujahideen in Menbej city and its countryside." According to a translation by an LCS employee included in the email chain, the document stated: "We ask you not to expose to the vehicles belonging to the Cement Company (Lafarge) commercial brand name (Rasekh and Thabet ) and not to expose to their workers and employees and not to touch the plant and the raw materials necessary for the plant's work for the general interest of the country and all Muslims." Executive 3's email, which he addressed to Intermediary 1, attached the document and reported that "the situation is slightly improving in the west of the plant. Since last Wednesday a few trucks and our employees were able to cross checkpoints without major difficulties," and he advised that the Jalabiyeh Cement Plant "should resume dispatch in a larger scale on Saturday 24 if the situation continues to stabilize." But Executive 3 also reported that "[t]he pending issue is on the east of the plant where it looks like the situation is still locked. This means that dispatching to Hassakah, Qamishli, Raqqah and Deir es Zor is still not possible."

42. Indeed, ISIS fighters in Manbij, to the west, permitted cement trucks to travel to and from the Jalabiyeh Cement Plant, even as the roads to Raqqah remained closed. On August 24, 2013, an LCS employee responsible for dispatching cement trucks provided LCS's risk manager with a photograph of a handwritten Arabic-language document that he had found with one of the drivers. The document, titled "The Islamic State of Iraq and al-Sham," authorized four named drivers for two named "owners of trucks, to transport four trucks of bagged fixed cement, from the Islamic State checkpoints for only <u>one time</u>." The letter was signed and dated August 22,

17

2013, and bore an ISIS-flag stamp with the Arabic text "The Islamic State of Iraq and al-Sham Aleppo Province The Emir of Manbij area and its surroundings."

43. On or about August 26, 2013, Executive 3 emailed Intermediary 1 a map of the area around the plant and summarized the "strong improvement" "[o]n the west side of the plant towards Menbij, Al Bab, Aleppo, Idlib" but highlighted that "[o]n the east side of the plant towards Hassakeh and Qamishli. There are 2 check points held by jihadists (see the map) which are blocking the trucks to go to and from the plants," and "[o]n the south of the plant, in the region of Al Thawra, Raqqah, Sokhna: there is a check point held by jihadists between Al Thawra and Raqqah and also potential problems at Sokhna." Executive 3 summarized the problem by stating "[g]enerally speaking, it is clear we have an issue with ISIS and Al Nusra in the east, especially in Raqqah." Intermediary 1 responded "no probleme let me work on it today . . . i cal u tomorow to breef you." The next day Intermediary 1 emailed Executive 3 to advise him that "We Negotiate with ( DAWLET AL IRAQ WAL SHAM ) AL ISLAMIA & AL NUSRA I got a News that the situation In the Plant is Very Good."

44. By November 2013, LAFARGE and LCS executives had agreed that Intermediary 1 should make fixed monthly security payments to ISIS. In a November 29, 2013 email, Executive 3 sent Executive 2 a list of "donations we are paying to [Intermediary 1] and that he is supposed to channel to the various beneficiaries." The email contained a "List valid from November 1, 2013" that included a 5,000,000 Syrian Pound monthly payment for "Daesh (ISIS)." Executive 3 further indicated that the monthly donation payments to all armed groups now totaled 24 million Syrian Pounds.

45. On February 4, 2014, Executive 3 directed Intermediary 1 to limit the monthly payments to armed groups to 20 million Syrian Pounds, including limiting assessments on sales to

18

200 Syrian pounds per ton. Intermediary 1 responded that his representatives were meeting with ISIS representatives ("daiich") in Raqqah and in Aleppo with ANF ("al nusra") regarding the payments.

46. Intermediary 1 explained in a March 31, 2014 email to Executive 1, Executive 2 and Executive 3:

> Is Lafarge able to bear a loss of about $600 million, because we are operating in a difficult situation? The second option is to endure bouts of anxiety and a sense of helplessness for a few moments (believe me, after every Skype with [PYD representative] or with Daich's Amir Minbej or Raqa my blood pressure rises to dangerous levels). Yet, I come back and say the loss will be greater for everyone. Even though I'm not completely comfortable in the relationship with Lafarge, I pressure myself to continue and I say tomorrow will be better for all of us, and we have to withstand two or three more years of unsettling circumstance. As long as we are selling and are able to overcome the obstacles, we should continue.
>
> Remember, we are dealing with militias that have a different thinking style than we do, and we are also dealing with the crazies on the other side
>
> I repeat, their logic is not like ours, but on my part, I have come to know all their keys and I am dealing with issues calmly, opening not shutting doors. I know I am jeopardizing my health, but prefer continuing with all the uncertainty which is better than stopping and losing everything. We currently sell for $8 to $10 million per month, with a $2 million profit, and pay less than ¼ for protection. Other factories are paying for protection just to exist, without making the profits we are. One day, I will tell you stories about the requests made by Daich or PYD, carrying their rifles feeling like they own the world. At times I feel like a clown entertaining children!
>
> They are all unsatisfied about us if we do what they want in this case we have to pay about 300milion SYP monthly.

47. Payments to armed militants allowed LCS to continue producing and selling cement at the Jalabiyeh Cement Plant through the spring of 2014. Executive 3 sent to Executive 4 on or about September 15, 2014, an email with Intermediary 1's initials as the subject line and two attachments. The first attachment was a document named "List of donations last version.pdf" that listed a monthly payment of 10 million Syrian Pounds to "Daesh" as of May 1, 2014. In a second attachment to the email, titled "Evolution of the security donations 2012-2013-2014,"

Executive 3 listed, in addition to the total amount of LCS's monthly "donation" payments, an additional "10 MSYP paid on April 23 to ISIS to unlock the West road." In a May 8, 2014 email, Intermediary 1 wrote to Executive 1, Executive 2 and Executive 3 that LCS's operations were not impeded by local armed groups, stating "(Daesh – PYD – Al Nusra –Abu Issa[6] all we have good relations recently. . . ."

### III.  LCS Purchases Raw Materials and Supplies from ISIS-Controlled Suppliers

48.  In or about late 2013, after ISIS expanded its control over the region, including quarries necessary for the production of cement, LCS began to purchase from suppliers within those territories raw materials and supplies to allow the continued production of cement. A written agreement on ISIS letterhead dated November 6, 2013, provided that LCS would purchase pozzolana—a type of volcanic ash used to create blended cement—from ISIS for 1,300 Syrian pounds per ton. The agreement, negotiated by an associate working for Intermediary 1, provided that ISIS would allow LCS's suppliers who mined and transported the pozzolana from ISIS-controlled quarries near Raqqah to retain some of LCS's payment for the raw material as profit.

49.  Also in or about late 2013, LCS began to use Intermediary 2 to engage directly with ISIS-connected suppliers for the purchase of raw materials and supplies. LAFARGE and LCS retained the services of Intermediary 2 after he had personally met with the then-LAFARGE Group Honorary Chairman and a member of the LAFARGE Board of Directors who was a former LAFARGE Chief Executive Officer on September 16, 2013. In an email to LAFARGE's Honorary Group Chairman in advance of the meeting, Intermediary 2 explained that he wished to discuss "[t]he security issue of Lafarge . . . in Syria. I build up strong relationships with civilian

---

[6]  "Abu Issa" refers to Liwa Thuwar al-Raqqa, an armed militia participating in the Syrian civil war.

and Military Locals including FSA, Kurds and Islamic state which are in control of all logistic path in and out of . . . Lafarge . . . ." In communications between Intermediary 2 and LAFARGE and LCS executives and employees after this meeting, Intermediary 2 repeatedly and explicitly identified ISIS as the seller of the raw materials that Intermediary 2 brokered. For example, in a September 24, 2013 email from Intermediary 2 to Executive 3 about a recent order with the subject line "Urgent Fuel pozzolana Coal petcoke/Islamic state," Intermediary 2 asserted that LCS had already agreed to accept pozzolana sold by ISIS and stated "FOR pozzolana 15000 tons ready to be shipped they are just waiting for signed P.O today max tomorrow please islamic state very senstive about this issue ." In a separate email chain on or about September 27, 2013, Executive 3 disputed Intermediary 2's assertion that LCS had already agreed to purchase pozzolana from Intermediary 2's suppliers, but nevertheless responded that "[a]fter my mail, our Purchasing team has contacted the contractor and the price is confirmed. We will place an order early next week for a limited quantity (probably around 5,000 tons) as we need to see how it will work.If it is OK we will increase the quantity." As another example, in a September 28, 2013 email to Executive 3, Intermediary 2 declared, "I OFFICIALLY REPRESENT ISLAMIC STATE FOR INVESTMENTS  and Soon for Kurdish.You ll get letter for that . So far im on LCS side but please Im asking kindly to have my Fees ."

50.     LAFARGE and LCS executives recognized the illegality under U.S. and Syrian law of transacting with ISIS. In a December 7, 2013 email, Executive 3 informed Executive 2 that a competitor cement company was potentially under investigation by Syrian authorities for "wrongdoings about heavy fuel oil transactions," and Executive 3 compiled a list of topics as to which LCS had an issue of compliance with Syrian government regulations, including "Purchasing gypsum and pozzolana from rebellion," "Purchasing Heavy Fuel Oil from rebellion," and "Paying

21

every month the various rebel entities." Executive 3 concluded that some of LCS's conduct was "questionable, even if they are needed for the business continuity." Similarly, on August 18, 2014, Executive 1 sent an email to Executive 2 and Executive 4 stating that the U.S. government had placed two militants from ISIS and ANF on the Specially Designated Global Terrorists list, which designation "institutes a travel ban on both individuals and also freezes any assets they may hold inside the United States."

51. Ultimately, LAFARGE and LCS executives approved the purchase of raw materials from ISIS-controlled quarries. In a December 4, 2013 email to Intermediary 1, Executive 1 and Executive 2, Executive 3 noted that besides the PYD "there is also all the other parties which are controlling some raw materials or fuels sources as well as some roads that our suppliers and customers are using." To continue to access these materials, LCS needed to "stay neutral and in good terms with all the stakeholders."

52. With the approval of LAFARGE and LCS executives, Intermediary 2 negotiated for LCS to purchase from ISIS critical raw materials necessary to the operation of the Jalabiyeh Cement Plant, including coal, fuel and pozzolana from the fall and winter of 2013 into early 2014. Intermediary 2 indicated in correspondence with LCS that he would use Raqqah-based suppliers with direct ties to ISIS to deliver pozzolana.

53. For example, in or about September and October 2013, Executive 3, through Intermediary 2, negotiated for the purchase of fuel and pozzolana from ISIS. In a September 27, 2013, email from a Raqqah-based supplier to LCS's procurement manager, the supplier offered the price of 1,641 Syrian pounds per ton of pozzolana, but stated the price would be raised to 3,500 Syrian pounds because "we won't allow importing this material or any other except through us since we have the quarry and it is at our service." The Raqqah-based supplier signed the email

with his title, "The Emir of the Investment Office in the Islamic State in Iraq and Sham. The Wilayat of al-Raqqa." In an agreement dated September 29, 2013, the initial negotiated price was 1,641 Syrian pounds per ton of pozzolana. Later, on or about November 26, 2013, Executive 3 confirmed with Intermediary 2 that, considering the delivery of the initial 10,000 tons of pozzolana to the plant, LCS would agree to order another 100,000 tons of pozzolana over the next six months at the "firm" price of 1,650 Syrian pounds per ton.

54. Negotiations into early 2014 between Executive 3 and Intermediary 2 culminated in LCS's agreement to purchase from ISIS-controlled suppliers 100,000 tons of pozzolana at 1,650 Syrian pounds per ton, another 100,000 tons of pozzolana at 1,675 Syrian pounds per ton, 4,000 tons of heavy fuel oil at 39,000 Syrian pounds per ton, another 12,000 tons of heavy fuel oil at 26,500 Syrian pounds per ton, 15,000 tons of "dirt" fuel at 17,500 Syrian pounds per ton, and an option for 35,000 additional tons of dirty fuel at the same price, as well as yellow sand and coal. Executive 3 reported these anticipated transactions to LAFARGE executives and, on or about February 16, 2014, Executive 3 referred to these negotiations in an email to Executive 2, writing that the "situation with Daech (the jihadists of Islamic State in Iraq and Sham (ISIS)) is relatively calm and we are currently finalizing purchasing of pozzolana and fuel oil."

IV. LAFARGE and LCS Conceal the True Purpose of the Payments to Intermediary 1 and Intermediary 2

55. LAFARGE and LCS executives, including Executive 2 and Executive 3, took steps to conceal payments made to Intermediary 1 and Intermediary 2. In this regard, LAFARGE and LCS executives directed Intermediary 1 and Intermediary 2 to submit invoices that did not reference their own names or the names of their companies, and that referenced payments for donations, unspecified professional fees, or personal expenses, in part to avoid discovery of their payments to ISIS-controlled suppliers.

23

A.     Intermediary 1

56.     LAFARGE and LCS adopted methods of payment to Intermediary 1 that were designed to arouse less suspicion by LCS's external auditors and conceal the purpose of the payments. Before the Syrian government seized Intermediary 1's assets, including his minority ownership stake in LCS and his Syrian company, LCS had compensated Intermediary 1 monthly under a "local project support agreement" for acting as a joint venture partner by paying him 1% of LCS's total net revenue. Under the "local project support agreement" monthly "turnover" payments were payable to Intermediary 1's Syrian company (the "Intermediary 1 Company"), and to satisfy LCS's external auditors, Executive 3 required Intermediary 1 to submit invoices to LCS on Intermediary 1 Company's letterhead. But following the seizure of Intermediary 1's assets by the Syrian government, including the seizure of the Intermediary 1 Company, LCS continued to pay Intermediary 1 as compensation for his "security" services negotiating with and paying armed militant groups on LCS's behalf, even as they sought ways to conceal the nature of LCS's ongoing relationship with Intermediary 1.

57.     Executive 3 repeatedly instructed Intermediary 1 to submit invoices for payment for his "security" services that did not reference Intermediary 1's name or the name of the Intermediary 1 Company, and directed Intermediary 1 to create a new corporate entity ostensibly unrelated to Intermediary 1 from which to submit invoices for "security" services. For example, in a December 13, 2012 email to Intermediary 1, Executive 3 specified that any future invoice should not be on Intermediary Company 1's letterhead, but instead should be on that of a company outside of Syria to be created by Intermediary 1:

> I would like to remind you that we still need to receive correct invoices from [the Intermediary 1 Company] for the months of September and October. We discussed this issue many times and you told me it is not a problem so please send them as

soon as possible. For the November payment, we cannot take the documents you prepared with [the Intermediary 1 Company] in the title.

As I told you, you need to send us the references of a [new] company located outside of Syria.

This will avoid problems with the Syrian authorities and with our Auditors.

We absolutely need to move forward before the end of the year to be able to present clean justifications for the [] closing of our accounts.

58. Executive 3 renewed the request on or about January 12, 2013, telling Intermediary 1 "we are in a very uncomfortable situation vis a vis our auditors." Later, on or about April 30, 2013, Executive 3 provided even more explicit instructions to Intermediary 1 regarding how to draft invoices that would not raise red flags:

One more time I would appreciate if you could send to LCS your invoices with a minimum of formalism so that they can be presented in case of request by the external auditors or by the Syrian authorities.

By not doing this, you are putting me personally and LCS in a difficult situation. We have been discussing this issue for six months now, our financial statements for 2012 cannot be approved by [LCS external auditors] because of that so we need to come to a conclusion.

We really need to get the references of the company you have formed in Dubai and they need to be mentioned on your invoices, even if we continue to settle the invoices in Syrian Pounds

We also need to receive from you the invoices prepared according to the template I sent you last time and that I am attaching again for your perusal.

Please do not mention any name on this invoice.

I am also resending you your invoice 001 for example.

We propose you to use the following numbering method:

1) Security invoice: numbering should be S (for security) followed by month/year

Example: invoice S-005/2013 means the invoice that we have paid today (you indicated in the document you sent yesterday it is for month of April but in fact it is for May as security amounts are paid in advance)

2) Turnover invoice:numbering should be T (for turnover) followed by month/year

25

Example: invoice T-004/2013 is the one you will have to prepare once we communicate to you the April turnover)

By doing such simple things, which may look minor, it would make things more "presentable" and help us a lot.

We should also talk about the local support agreement and redefine it so that it can substantiate the invoices.

But the most urgent is to have appropriate invoices.

59. On May 29, 2013, Executive 2 and Executive 3 met with Intermediary 1 in Dubai to discuss the list of armed militant groups that Intermediary 1 was to pay on LCS's behalf, and to discuss changing LAFARGE's and LCS's relationship with Intermediary 1 to publicly disassociate LCS from Intermediary 1, while continuing to use Intermediary 1 to deal on their behalf with armed militants. Specifically, LAFARGE and LCS executives began pushing Intermediary 1 to resign from LCS's Board of Directors but to continue managing LCS's relationships with armed militants in the area of the Jalabiyeh Cement Plant by forming a new "consulting" company that would enter into a "support agreement" with LCS.

60. On June 16, 2013, Executive 3 emailed Executive 1, Executive 2, Executive 5 and In-House Lawyer 1 regarding news that the Syrian government had sentenced Intermediary 1 to death in absentia and had converted the preliminary seizure of Intermediary 1's assets, including his shares in LCS, into a permanent confiscation of those assets. On June 30, 2013, Executive 3 wrote Intermediary 1, "[W]e cannot continue the way we are settling the turnover invoices. Our preferred option would be the one we told you last October: a bank transfer in USD to the account of a duly registered company," as opposed to a direct payment to Intermediary 1 in cash, which would appear more suspicious.

61. LAFARGE and LCS executives directly negotiated the amount of Intermediary 1's compensation for his services, and the payments were explicitly conditioned on Intermediary 1

26

continuing to make payments on LAFARGE's and LCS's behalf to armed groups, which included ISIS and ANF. In an August 2, 2013 email to Executive 2 and Executive 3, Executive 5 confirmed that he had concluded negotiations with Intermediary 1 with an agreement to make monthly payments of $75,000, of which Intermediary 1 would retain $50,000 and the remaining $25,000 would be disbursed to armed groups. Executive 2 responded that the arrangement was acceptable, so long as the Jalabiyeh Cement Plant remained open. The agreement was formalized in a February 2, 2014 "External Support Agreement" between LCS and Intermediary 1's new company ("Intermediary 1's New Company") in which LCS agreed that "[f]rom July 1.2013, [LCS] shall pay a monthly remuneration of 75.000USD," but the agreement provided that in light of "the circumstances prevailing in Syria and the unpredictability of the situation" the $75,000 compensation would only be payable "in respect of any given month provided [LCS] has sold a minimum quantity of 75,000 tons of cement during the" three previous months. Executive 3 signed the External Support Agreement on behalf of LCS. An individual who worked for Intermediary 1 signed the External Support Agreement on behalf of Intermediary 1's New Company, however the document made no reference to Intermediary 1.

62.     LAFARGE executives were also directly involved in falsifying records relating to the payments made to Intermediary 1. For example, in an August 5, 2013 email Executive 3 wrote to Executive 2, "Could you please approve, sign and send me back a scanned copy of the attached expense claim for the recently agreed remuneration of [Intermediary 1]? It will be transfered directly to his offshore account from an account LCS is having through [a Lafarge subsidiary] in Egypt. This is the way we intend to proceed in the future to severe any suspicion in connecting LCS and [Intermediary 1]." The attached expense claim form called for the payment of $75,000 in cash for "Operating expenses for July 2013," and the corresponding code of "Expat others."

The expense claim did not reference Intermediary 1, the true nature of Intermediary 1's work for LCS, or any company associated with Intermediary 1.

B.    Intermediary 2

63.    LAFARGE and LCS executives made similar efforts to disguise the nature of the payments to Intermediary 2. On January 12, 2014, Executive 3 directed Intermediary 2 to send an invoice from Intermediary 2's company (the "Intermediary 2 Company") that only referenced environmental consulting, rather than payments regarding raw materials:

> Prepare an invoice from [the Intermediary 2 Company], send to me by email and bring the original next week, for an amount of 4,402 USD just with "Environmental consultancy services for the months of October, November and December 2013" as a justification.
>
> For your understanding hereunder are the details of the calculation:
>
> - pozzolana: 18,270 tons equivalent to 914 USD (he has delivered the first order of 15,000 tons and 3,270 tons out of the order of 100,000 tons)
>
> - HFO: 3,488 tons equivalent to 3,488 USD (he has not yet completed the first order of 4,000 tons, it remains 512 tons to deliver and he has not started the 12,000 tons of standard quality)
>
> Total: 4,402 USD
>
> Thanks to comply for a smooth settlement

64.    On or about February 5, 2014, Executive 3 reiterated his directions to Intermediary 2 for invoicing that did not reference shipments from ISIS-controlled suppliers, but rather environmental consulting payments:

> If you want to have a chance to get paid for pozzolana and HFO, you have to prepare an invoice following my instructions and not your imagination.
>
> So you have to issue an invoice mentioning only:
>
> Consultancy services performed up to January 31,2014 for a total amount of 4,836 USD
>
> This amount has been calculated as follows (up to 31-1-2014) HFO: 3,488 tons out of the order of 4,000tons= 3,488 USD

Pozzolana: 15,000t out of the order of 15,000t ( completed) plus 11,964t from the order of 100,000t i.e total 26,964/20= 1348 USD

Send me the invoice asap so that you have a chance to be paid next week.

65. On February 13, 2014, Intermediary 2 sent Executive 3 an invoice "[b]ase[d] on your instruction." The invoice, payable to the Intermediary 2 Company, purported to be for "[c]onsultancy services."

## V. LAFARGE and LCS Attempt to Negotiate a Long-Term Revenue-Sharing Agreement with ISIS

66. As ISIS gained strength and control of more territory near the Jalabiyeh Cement Plant, ISIS sought to increase its share of LCS's sales revenue. On or about July 1, 2014, after Intermediary 1 updated Executive 3 about payments by distributors to ISIS ("Daesh") per ton of cement, Executive 3 responded that the roads to the east of the plant were inaccessible and asked whether it was because ISIS "wants more money from them, if yes how much" or "are they waiting for the approval of someone ?" Intermediary 1 informed Executive 3 that ISIS wanted a monthly payment of 40 million Syrian pounds, a large increase from the 10 million Syrian pounds agreed to previously, which Intermediary 1 had refused ("My policy is to let them [wait] for while and then open Chanel for negotiations."). Intermediary 1 further explained that in its negotiations LCS needed to be careful not to provoke ISIS to take over the Jalabiyeh Cement Plant.

67. In response, LAFARGE and LCS executives authorized Intermediary 1 to negotiate an agreement to pay ISIS an amount based on the revenue from the plant in return for passes that allowed LCS employees, suppliers and distributors to pass through ISIS checkpoints on the roads leading to the Jalabiyeh Cement Plant. As part of the deal, which was directed by Executive 1, Executive 2, and Executive 4, who had just been transferred from his role at another Lafarge subsidiary to replace Executive 3 and was transitioning into the role of CEO of LCS, LAFARGE and LCS, through intermediaries, sought ISIS's assistance to initially equalize the treatment of and

29

subsequently suppress the flow of cheaper Turkish cement into Syria, which was undercutting the prices LCS could charge for its own cement. The issue of Turkish cement, which Executive 3 complained was "flood[ing]" the market, had long been of critical importance to LAFARGE and LCS executives.

68. Throughout the negotiations, LAFARGE and LCS executives insisted that the name "Lafarge" not appear on any contract with ISIS or on the passes issued by ISIS. Later, when the negotiations eventually broke down in the midst of a growing international and multilateral effort to defeat ISIS, LAFARGE and LCS executives, including In-House Lawyer 1, concealed their ties to Intermediary 1.

A. Revenue-Sharing Negotiations

69. Throughout negotiations with ISIS through Intermediary 1, LAFARGE and LCS emphasized the need to block or tax imports of cement from Turkey into Syria in a manner comparable to the levies imposed by ISIS on LCS's cement. A May 21, 2014 email from Intermediary 1 to Executive 3 conveyed a proposal from ISIS to "stop the Turkish cement to pass from their borders totally[.] And asked: If we do that what are we [LCS] going to do conversely? . . . I replied our sales might . . . increase and maybe your compensation too[.]" In response, Executive 3 questioned whether ISIS had sufficient control to actually block Turkish cement imports, and opined that responding affirmatively to ISIS was not a good idea, noting that if ISIS were to do as they had proposed, "it would increase our dependence to Da'ech [ISIS], who could also after that want to dictate us selling prices or else," and further noted that if LCS were to be the only company permitted by ISIS to sell cement "it presents a high risk in terms of image and we cannot in any manner have such an agreement, even unformal." Instead, Executive 3 proposed that ISIS should "take a 'toll fee' on each truck loaded with Turkish cement. This fee should be

equal or higher than the fee they charge to our distributors." Executive 3 opined that such a toll fee on Turkish cement would allow ISIS to gain revenue while simultaneously "reduc[ing] the attractiveness of Turkish cement. It would reinforce our competitiveness [and] therefore increase our volumes and increase the fees paid [to] our distributors or Da'ech [ISIS]."

70. On or about June 15, 2014, LCS's risk manager reported to Executive 3 that ISIS had refused to renew the vehicle passes for the roads to the East of the Jalabiyeh Cement Plant and had informed him through a connection that ISIS wanted to "rise the the tax to 40 million SYP." On June 17, 2014, LCS's risk manager reported to Executive 1 and Executive 3 that he had gone to Raqqah to meet with an individual with contacts in ISIS's leadership. LCS's risk manager reported that he had complained that the figure was "very high" and listed LCS's conditions, including that ISIS would "[i]mpose[] tax on Turkish cement in 4 [ISIS] provinces" and "[o]pen[] the blocked roads from Ar-Raqqah."

71. On or about July 10, 2014, Intermediary 1 emailed Executive 1, Executive 2 and Executive 3, updating them on his efforts to reach a "durable agreement" with ISIS:

> Considering that the situation in the area of the factory is so sensitive and strained, yesterday we started negotiations to reach to a fix agreement with the ISIS and the highest authorities, provided that it will be durable agreement, instead of semi – monthly. The agreement must provide for protecting the product and facilitating the passage of the product and the raw materials from and to the factory. It provides also that the Turkish cement that is produced in other factory must be treated according to the same conditions of the factory, i.e costs are imposed on its passage on any of the roads controlled by the ISIS.

> Taking into consideration the international political situation, we expect the ISIS will stay in the region for a long term, so we have to deal carefully with them.

72. A July 14, 2014 email from Executive 3 to Executive 4 and Intermediary 1 set forth the overarching principles regarding any agreement with ISIS, including omitting the company's

name from any signed documents, processing payments through LCS customers rather than through LCS, and ISIS's agreeing to block or tax imported cement from Turkey:

> 1) the name of LCS must never appear in any signed document
>
> 2) the amount of the agreement must be on a per ton sold basis, not a lump sum as it must be linked to our level of activity
>
> 3) it has to be processed through our customers. We can give them the quantities sold to each customer to avoid that they try to minimize the quantities they purchase from us.
>
> 4) we are not in favor of formally blocking GOC cement to be sold in this area but they should charge something similar to us.
>
> 5) regarding Turkish cement, it would be good either to block it or to ask for a much higher fee as this cement is not bearing the amount of the consumption tax (1400 SYP/ton) that it should when entering Syria, meaning huge profits for importers.

In this context "GOC cement" referred to cement manufactured by Syrian government-owned plants located in other regions of Syria, while the Jalabiyeh Cement Plant sold cement in the areas near the Turkish border. That same day, Executive 3 clarified LCS's stance that it would discount prices to customers based on the taxes the customers paid to ISIS:

> In fact we do not deduct any amount from our customers but we adjust our selling prices to them, assuming they will have to bear 500 SYP per ton to go through the various check points to get their cement delivered. If they spend less, it is additional margin for them, but if they spend more it is their problem, not ours.

Executive 3 forwarded the email to Executive 2 that same day.

73. LAFARGE and LCS executives repeatedly expressed their commitment to revenue sharing with ISIS in the hope that it would incentivize the terrorist group to act in LCS's economic interest. On July 23, 2014, Executive 2 wrote to Executive 3 and Executive 4:

> We have to maintain the principle that we are ready to share the "cake," if there is a "cake." To me, the "cake" is anything that is a "profit", after the amortization and before financial expenses.
>
> Therefore, a tax by the ton is the only one that would make sense in this context.

If we get a fixed tax, unless it's just a symbolic one, it would not make sense because they won't have a vested interest to have the plant run well.

74.  Intermediary 1 followed these instructions in negotiating an agreement with ISIS. He regularly updated executives from LAFARGE and LCS about the progress of negotiations and received frequent reminders from them to eliminate any direct reference to "Lafarge" from documents, to discount prices to LCS's customers based on the customers' payments to ISIS, and to obtain ISIS's agreement to tax Turkish cement imports to allow LCS to increase the price of its cement. For example, on July 21, 2014, Executive 4 wrote to Intermediary 1:

> [W]e need to stick to the principle of payment based on sold ton, performed by distributor / did ISIS mention anything about taxing Turkish cement? . . . . the testament . . . by LCS is feasible as soon as no other party is mentioned on it ('to whom it may concern' is ok).

75.  On or about July 30, 2014, Executive 3 sent an email to Executive 4, his successor as CEO of LCS, explaining the reasons for LAFARGE's and LCS's negotiating position with the PYD and ISIS and LCS's existing arrangements with the PYD, ISIS and other armed groups. Executive 3 first explained that he doubted whether Intermediary 1 actually paid all of the amounts he was given by LAFARGE and LCS to armed groups like ISIS: "[T]his means that rather to giving him [Intermediary 1] the cash to distribute it to the parties, it is better if the money can be paid by others directly to the parties." Similarly, Executive 3 wrote that LAFARGE and LCS should focus on negotiating a variable-fee agreement that tied LAFARGE's and LCS's obligation to pay PYD and ISIS to the amount of cement sold from the Jalabiyeh Cement Plant. Executive 3 explained that the arrangement should ensure that the payments would be made by LCS's customer-distributors directly to PYD and ISIS, and to ensure that PYD and ISIS were able to collect the full amount of the payments from the customer-distributors, LCS would provide PYD and ISIS with records of LCS's sales to its customer-distributors:

- we should strive to have everything variable on a SYP/ton basis or at least minimize the monthly fixed fee - the variable portion should be paid by the distributors, not by us, but we would give the monthly volumes to the parties to make sure distributors are not playing a nasty game...

- against this payment, distributors should get receipts that would justify payments have been actually done

- we need to know more about their promise to block Turkish cement, it is by far too vague

Heeding Executive 3's advice, the same day Executive 4 followed up with Intermediary 1 on the status of the negotiations with the PYD and ISIS, telling him, "Generally we need to keep the fixed part (paid by us thru you) to stay as minimum and variable part to be paid by customers as much as we can," and asking for "more information about the way PYD and Daesh [ISIS] will control turkish cement import: stop it, implement tax? [H]ow much, to be paid how?"

76.    In August 2014, Intermediary 1 informed Executive 4 that, as part of any agreement, ISIS wanted a monthly fee in addition to an assessment on each ton of cement sold. Intermediary 1 stated:

Negotiations with ISIS are complex and not easy at all. In their last request yesterday, they asked us to pay S.P.100 million/month, but I told them today morning that they will gain more than 100 million/month from the factory in case the agreement includes the fixed monthly amount + the introduction amount + the amount of our purchases of pozolana, sand and fuel.

77.    On August 4, 2014, Executive 4 instructed Intermediary 1 that if ISIS wanted more money from LCS, it should reduce LCS's competition so that LCS could raise its prices: "If ISIS wants higher tax from us, it's better for them to stop Turkish cement and Iraki cement, so that we may increase the price." In response, Intermediary 1 informed Executive 4 that ISIS was prepared to stop importation of Turkish cement upon consummation of an agreement. Addressing Executive 4's question as to whether payment to ISIS would be made by LCS's customer-distributors rather than by LCS itself through Intermediary 1 ("[T]he payment is still to be made

directly by customers, ok?"), Intermediary 1 responded: "yes by customers . to the isis, and by us to py d."

78. On or about August 5, 2014, Intermediary 1 sent Executive 4 a proposed agreement with ISIS calling for an equivalent taxation rate of ten percent of LCS's profits and a blank vehicle pass that ISIS would issue to allow employees, customers, and suppliers to drive to and from the Jalabiyeh Cement Plant:

> Attached are copies of both agreements, which must be signed by our party in Turkey by the end of the day. The agreement is upon 10% of the profits, as for ISIS a fixed payment is inacceptable, because it's against Al Sharia principles which they use as an apparent excuse. Therefore, the agreement is in a deceptive form. We agreed to pay them 750SYP/Ton every 15 days from the distributers who approved, and I will personally pay the mediator 50 SYP/Ton monthly which I will deduct from the fixed monthly payments.

The contract, depicted below, is between LCS (referred to as the "Jalabiyeh Cement Plant," rather than "Lafarge" or "Lafarge Cement Syria SA") and ISIS:



بسم الله الرحمن الرحيم

وثيقة اتفاق

الطرف الأول معمل الاسمنت الجلبية

الطرف الثاني : دولة الخلافة الإسلامية

تلاقت إرادة الطرفين على أن يقدم المعمل ما نسبته عشرة في المئة من أرباح الشركة عن
المواد المنتجة والعبارة لأراضي دولة الخلافة الإسلامية على أن تكفل الدولة الإسلامية تأمين
أليت الشركة الموجودة ضمن أراضيها بحرية كاملة وتتعهد الشركة بتقديم فواتير عن الأرباح
كل أسبوعين ويتم تسديد المبلغ المترتب على الشركة على دفعتين كل أسبوعين

يعتبر هذا الاتفاق ساري المفعول اعتبارا من تاريخ /    /    /    /    /    /

وتقدم دولة الخلافة الإسلامية تصريح عبور للسيارات الخاصة بالشركة

الطرف الأول : معمل الجلبية         الطرف الثاني : دولة الخلافة الإسلامية

79.     The next day, August 6, 2014, Executive 4 confirmed to Intermediary 1 LAFARGE's and LCS's agreement to an equivalent taxation rate of ten percent, in return for the free movement of LCS employees, customers and suppliers, as well as ISIS's agreement to stop importation of Turkish cement in areas under its control:

As per our phone call today, hereafter what I understand from the agreement with ISIS, that I approve:

- ISIS will receive the payment of 750SP/ton, by customers, every two weeks

- ISIS ensure the security and the free movement of our customers and suppliers vehicles as well as our employees

- ISIS will stop import of Turkish cement in the areas under its control (as of today: Al Rakka, Dair El Zor, Hasaka, Qamishli and Al Mayaden, Srin, Menbij, Al-Bab, Deir Hafer and Maskaneh), or implement in those areas taxes as high or higher than to Jalabieyeh cement plant.

- The agreement is valid until February 5th, 2015.

I hope the agreement to be signed today, and sales to restart tomorrow.

ISIS needs to clarify which office (AlRaqqah or Membij) is certified to receive payments and deliver permission letters.

80. Later that day, Executive 4 confirmed to Executive 2 his understanding with Intermediary 1 that ISIS would receive 750 Syrian pounds per ton paid every 15 days by LCS's customer-distributors, with the fixed part subject to change (10 million Syrian pounds as of the date of the contract). Executive 4 further indicated that ISIS appeared committed to stopping Turkish cement imports or to setting up a tax at least equal to that paid by LCS at their checkpoints. Executive 4 noted that the payments to ISIS would impact the sale price of LCS's cement, and thus the rolling forecast ("RF") of LCS's earnings before interest, taxes, deductions and amortization ("EBITDA"), prompting Executive 2 to respond that he did not want taxes "collected" by ISIS to exceed 50% of the normal contribution.

81. Even though LAFARGE and LCS executives communicated their consent to the proposed agreement through Intermediary 1, ISIS waited to execute the agreement and then asked for additional concessions. On or about August 15, 2014, Intermediary 1 informed Executive 4 that ISIS had changed its stance yet again regarding the rate of taxation, as communicated during a recent meeting:

> Da'ysh [ISIS] have changed their mind and began to negotiate that they want 10% of the cement, and they want them as cement, in addition to that, they want 25% out of the value of our raw materials according to the bills.

. . . .

They will take S.P1500 for each ton sold in their areas . . . . And in addition, they take SP 15 millions monthly as charges of the pass of workers and raw materials. Payment must be via prior advances . . . .

They are waiting for our reply tomorrwo before 12 in the morning, because they will held a meeting with [ISIS leader] al Baghdadi tomorrow at night, and they will be busy for a month or more, so they will not be able to meet us in the meanwhile.

I suggest to discuss the matter with [Executive 2], and to agree on their conditions, because, regarding the ground situation, I think they will control the area almost in a month, and then we will give them what we are giving to [another armed group] now.

82.     Executive 4 forwarded the message to Executive 2 and indicated that, although LCS was supposed to receive the "passes," ISIS had apparently changed its mind. Executive 4 stated that he was attempting to verify Intermediary 1's information. Executive 2 wanted to know the effect of the agreement with ISIS on LCS's operating margin, and reminded Executive 4 that ISIS was a terrorist organization:

Can you reiterate to me the agreement . . . with ISIS and how much of our operational margin it is?

PS In the same vein, we should not forget that ISIS is a terrorist movement.

83.     On or about August 15, 2014, Executive 4 recommended accepting ISIS's demands, providing a rough estimate of the new terms on the calculation of LCS's EBITDA, and observed that LCS's operating margin for the third and fourth quarters would depend on how successfully ISIS blocked Turkish cement imports. Executive 4 promised to provide more precise calculations after consulting with LCS's Chief Financial Officer ("CFO") about which portion of the payments to ISIS would be included in LCS's accounting of its selling, general and administrative expenses ("SGA"):

Regarding the exact calculation of the operational margin, I will see with my CFO [] these next few days in Beirut, because a portion of the fees is absorbed by SGA.

Roughly speaking, the new RF gives an EBITDA of 2700 Syrian Pound per ton (vs. 3000 last month).

But the Q3-Q4 margin is going to depend on the prices and the Turkish imports that ISIS pretends being able to block.

I'm having the information cross-checked; what [Intermediary 1] has been stating is accurate. . . . our risk manager whom I met in Amman these last few days, was not able to re-cross the border because of battles and is stuck in Ganzatiep. ISIS has retaken a few sites in the North and is targeting our region.

Currently, our stocks are full, and the quality of the cement is deteriorating. So, all we can currently sell is welcome, especially if the battles intensify in the region next month.

I recommend acceding to the request of ISIS.

84.     On or about August 15, 2014, the United Nations Security Council issued a resolution condemning ISIS, ANF and Al-Qaeda, and calling on U.N. members to prohibit all financial and trade relations with the groups. On August 18, 2014, the United States Department of State added ISIS member Mohamed Al-Adnani and ANF member Said Arif to its list of Specially Designated Global Terrorists. The escalating global response to ISIS and ANF prompted concern from the LAFARGE and LCS executives who were already negotiating with and paying ISIS through intermediaries. On August 18, 2014, Executive 1 emailed Executive 2 and Executive 4 with the subject heading "terrorist watch list" and wrote that the United States had designated ISIS's Al-Adnani and ANF's Arif to the list of Specially Designated Global Terrorists.

85.     On or about August 20, 2014, Executive 4 emailed Executive 1 and Executive 2 an update about negotiations with ISIS: "According to the last conversations, the distributors will advance cash to ISIS in order to access the plant, with replenishment every two weeks depending on sales. I will see with [In-House Lawyer 1] the consequences of this kind of deal." In this email, Executive 4 stated that he planned to consult with LAFARGE's internal counsel regarding the

latest negotiations with ISIS, which involved LCS's customers paying a fee to ISIS to access the Jalabiyeh Cement Plant rather than direct payments to ISIS through an intermediary.

86. After entering into the revenue-sharing agreement with ISIS, LAFARGE executives involved in the negotiations with ISIS updated LAFARGE's Executive Committee. Notes of LAFARGE's August 27, 2014 Executive Committee meeting reflect that Executive 2 highlighted ISIS's agreement to impose costs on imported Turkish cement that were equal to the costs imposed on LCS: "In our agreement with Daesh [ISIS], we said that in terms of taxation we must have the same treatment as Turkish imports." The notes further reflect that Executive 6 responded that "we have to make sure that what we do is risk free (also vis-à-vis the U.S.)" In response, Executive 2 replied that "the best protection is to keep the plant in operation, sales have resumed, we are maintaining contact with everyone."

B. ISIS Issues Vehicle Passes That Refer Explicitly to "Lafarge"

87. Pursuant to its agreement with LCS, ISIS issued LCS passes that the drivers of cement trucks could show to demonstrate their authorization to pass through ISIS-controlled checkpoints. On September 4, 2014, Executive 4 complained to Intermediary 1 about the passes that specifically referred to "Lafarge" by name:

> The name Lafarge and the fact that Lafarge 'paid' appears on the laissez-passer passes issued by ISIS. This is completely against our agreement with ISIS. It is clear that these passes were issued for the distributors, not for Lafarge. Could you look into solving this issue?

Intermediary 1 agreed that "we have to change the name or have an alias that all the laissez-passer passes use as well as the distributors because ISIS cannot let all the cements get through, just ours."

88. On September 8, 2014, Executive 4 traveled to Paris, France to meet with In-House Lawyer 1. The next day, Executive 4 emailed Executive 1 with the subject line "Clearance Raqqah" regarding two ISIS passes, one from ISIS officials in Manbij, which mentioned

40

"Lafarge," and one from ISIS officials in Raqqah, which did not. Executive 4 asked Executive 1 to share the documents with Executive 2, and Executive 1 agreed. The same day, Executive 4 forwarded copies of the passes to Executive 1 and commented that, as to the Raqqah pass, "All are without mentioning our company name." Executive 4 further wrote, "Thank you for sharing this information with [Executive 2], I don't want to write to him about this topic at his professional address (as recommended by [In-House Lawyer 1])." indicating that In-House Lawyer 1 had instructed Executive 4 not to create an email record of the communications. Executive 1 replied that he had also had the Manbij pass translated, and that he agreed it clearly referred to the plant and "Lafarge," and that he would discuss this the next day with Executive 2.

## VI.    LCS Evacuates the Jalabiyeh Cement Plant

89.    On September 9, 2014, while posing as one of the ISIS-controlled suppliers for whom he had brokered materials purchase agreements with LCS, Intermediary 2 wrote an email to Executive 4 with the subject line "lafarge crisis pending payments" stating, "For past 2 months [LCS] didn't pay us our money… Please try to understand this money of supplier who work with strongest islamist army on ground so Lafarge shouldn't mess around with them…[an individual] did the impossible to calm them down…but Lafarge cross the line. We need total by the end of this month Please situations become critical."

90.    The following day, September 10, 2014, an LCS employee responsible for procuring raw materials stated in an email to Executive 4, "Previously I took the risk to communicate with this person and am risking my life for the sake of the company and the continuation of the business. But the situation going more and more I must stop here and I ask your help to nominate any other person from Lafarge to communicate with this supplier as I could not continue risking my life."

41

91. On September 10, 2014, President Barack Obama addressed the nation to outline the United States' strategy to lead an international coalition to "degrade and ultimately destroy" ISIS through direct military action, and the President identified ISIS as "a terrorist organization, pure and simple" with "no vision other than the slaughter of all who stand in its way."

92. The next day, Executive 4 emailed Executive 2 stating that In-House Lawyer 1 had asked Executive 4 to suspend all payments the previous day and to wait for instructions following a forthcoming meeting with Executive 6. Executive 4 argued against shutting down the Jalabiyeh Cement Plant. Although Executive 4 stated that he understood that "no risk should be taken that would hinder the completion of the merger with Holcim," Executive 4 argued that the Jalabiyeh Cement Plant was "located in a Kurdish pocket which has no strategic, economic or military interest that would justify an attack by ISIS," and argued that if LCS suspended operations "for the next few months until after the completion of the merger, we will surely be watched closely when we seek to resume them, and nothing says that the area will have been freed from the grip of ISIS, nor that it will be free from it for years." Referring to the ISIS-issued vehicle passes, Executive 4 indicated that he had sent Executive 1 "some documents issued for our distributors in Membij and Raqqah" but stated that he had not sent this information to In-House Lawyer 1, who had told Executive 4 that he "prefer[red] not to receive anything by email." In a subsequent email sent later that night, Executive 4 wrote to Executive 2 that he had heard from Executive 1 about the meeting Executive 6 had had with LAFARGE's in-house general counsel, and provided his personal telephone number.

93. On September 12, 2014, Executive 1 sent Executive 2 an email with the subject line "Syria", which read in part: "The two points that worry the legal unit are our relationship with

[Intermediary 1] and the contacts of our providers and distributors with the jihadist networks."

Executive 1 wrote:

> I think it's imperative to maintain the plant in working order and to be able to restart quickly. We can, provided we accept the costs, ask the Kurds to ensure the physical protection of the site and of the Lafarge families who wish to remain there to continue maintenance work. It seems to me that this option is totally doable, if the strikes of the coalition quickly weaken the jihadist forces. The plant will no longer be an objective for them.

94. Several hours after his email to Executive 2, Executive 1 emailed Executive 4 telling him that "[Executive 2] has received positive guidance from [Executive 6]" and then repeated to Executive 4 the proposal that he had earlier sent to Executive 2. Executive 4 replied by thanking Executive 1 for the email and repeated the argument he had previously made in an email to Executive 2 to continue operating the Jalabiyeh Cement Plant, noting that he planned to speak to Executive 2 later that day.

95. Ultimately, however, LCS evacuated the Jalabiyeh Cement Plant just ahead of advancing ISIS militants, on or about September 18, 2014. ISIS seized the plant the next day, on September 19, 2014. After ISIS militants seized control of the Jalabiyeh Cement Plant, ISIS released propaganda videos showing a small number of its fighters driving between the cement factory buildings.

VII. LAFARGE and LCS Executives Falsify Records to Conceal Their Relationship with Intermediary 1

96. Following the evacuation of the Jalabiyeh Cement Plant and the commencement of coalition military action against ISIS, LAFARGE and LCS executives attempted to conceal LAFARGE's and LCS's relationship with Intermediary 1 to negotiate an agreement with ISIS in July and August 2014. They did so by drafting a backdated contract-termination agreement that

would allow them to falsely claim that Intermediary 1's relationship with LCS had been terminated when he conducted negotiations with ISIS in August and September 2014.

97. On September 29, 2014, Intermediary 1 notified Executive 2 and Executive 4 that, as LAFARGE and LCS executives had previously requested, he had opened a bank account in Dubai in the name of a new company that was not publicly linked to Intermediary 1 ("Intermediary 1 New Company"), and he demanded payment for his services to LCS over the prior three months. Executive 4 forwarded the email to a LAFARGE executive responsible for financial operations and In-House Lawyer 1, asking which LAFARGE entity could transact with Intermediary 1's new company.

98. In an October 9, 2014 email to Executive 2 and In-House Lawyer 1 with the subject "New contract for [Intermediary 1]," Executive 4 noted that LCS owed Intermediary 1 "Monthly fees 2*75kUSD for services in July and August" plus "August sales tax to PYD, already paid by [Intermediary 1] to PYD : 10.5 M SYP = 60kUSD)" totaling "210kUSD." Executive 4 further wrote that In-House Lawyer 1 "would like to terminate the previous contract [with Intermediary 1] on the date of 18th August to show evidence of company reaction to UN resolution, and to get a new contract to start from September 1st, 2014." In a subsequent email on October 14, 2014, Executive 2 made clear that LAFARGE would not pay Intermediary 1 without a new backdated contract. On October 14, 2014, In-House Lawyer 1 attached a revised version of the new contract and instructed Executive 4, "We will have to explain to the consultant [Intermediary 1] that this new contract must be signed at the same time as the termination agreement of the former contract, which I also attach to this email."

99. The "UN resolution" Executive 4 referred to was the August 15, 2014 Security Council resolution condemning ISIS, ANF and Al-Qaeda and calling on U.N. members to prohibit

all financial and trade relations with the groups. Thus, the October 9, 2014 email from Executive 4 conveyed the proposal that LAFARGE require Intermediary 1 to sign a backdated termination agreement that could falsely be offered as "evidence" that, on August 18, 2014, the next business day after the U.N. Security Council Resolution, LCS had terminated its relationship with the intermediary who had negotiated with ISIS on LCS's behalf. The email from In-House Lawyer 1 similarly made clear that Executive 4 should procure Intermediary 1's agreement to simultaneously execute the backdated termination agreement with LCS and the new consulting agreement with the Cypriot entity through which LAFARGE held nearly all of its shares in LCS (the "LCS Holding Company"), with an agreement to make lump payments to Intermediary 1 for past services rendered.

100. On October 14, 2014, Executive 4 sent an email to Intermediary 1 with the subject line "Agreement for Regional Security Consulting Services," attaching copies of the new consulting agreement between the LCS Holding Company, and Intermediary 1's New Company, and the backdated Termination Agreement between LCS and Intermediary 1's New Company. Executive 4's email cited the U.N. Security Council Resolution, and noted that it was necessary for Intermediary 1 to sign the agreements "in order to protect our respective interests":

Please find attached the new contract that we would like to sign with you.

It is written in such a way as to:

- Integrate the constraints of UN resolution 2170 issued on August 15, 2014.

- Establish a contractual relationship with the [LCS Holding Company], instead of Lafarge Cement Syria.

- Take into account the compensation for termination of the previous contract (210k USD for 202k USD which are actually due).

Remunerate your information and consulting services while commercial activities are suspended, whereas the previous contract did not have a provision for

remuneration when the sales were too low (less than 75k over three consecutive months).

To take effect, this new contract must be signed at the same time as the termination of the last contract.

As explained on the phone, this contract includes the possibility of special services (article 2.2) which we all hope will not be needed.

In spirit, you are and remain a long-time partner of Lafarge in Syria. In writing, our relation must be standardized in order to protect our respective interests.

Thank you for reading these documents and returning them signed.

The new consultancy agreement between Intermediary 1's New Company and the LCS Holding Company provided for a lump sum payment of $210,000 and monthly payments of $30,000 to Intermediary 1 for security consulting. The agreement was dated "[] October, 2014." As part of the new consultancy agreement which "shall come into force on 01 September 2014," Intermediary 1 was required to agree to the following:

. . . abide by the highest ethical standards and shall comply with:

(a) all applicable laws and regulations;

(b) international treaties and conventions on the prohibition of corruption and the prohibition of financing of terrorism, including, without limitation, (i) the 1999 Convention for the Suppression of the Financing of Terrorism, (ii) the OECD International Standards on Combatting Money Laundering and the Financing of Terrorism and Proliferation, (iii) Resolutions 1373 and 2170 of the Security Council of the United Nations preventing any relationship with Islamist extremist groups, and

(c) Lafarge Code of Business Conduct (a copy of which has been delivered to the Consultant prior to signing this agreement) and with the applicable safety rules issued by the Company's affiliate(s) in the Region.

The new consultancy agreement also included a non-disclosure provision, which required Intermediary 1 to maintain the confidentiality of information he learned about LCS Holding Company and "its affiliates," such as LAFARGE and LCS, "including the existence of this agreement."

101. Notably, as Executive 4 explained in his email to Intermediary 1, the $210,000 lump sum payment compensated Intermediary 1 for the work he had already performed negotiating an agreement with ISIS, and to reimburse him for making the fixed monthly "donation" payments to armed groups, including ISIS—a clear violation of the new consultancy agreement's explicit requirement that Intermediary 1 abide by international prohibitions against terrorism financing. In the same email to Intermediary 1, Executive 4 also attached a file named, "Termination Agreement," between LCS and Intermediary 1's New Company, which was backdated to August 18, 2014. The metadata of the backdated Termination Agreement indicates that the document was drafted by In-House Lawyer 1 and that it had been created on October 3, 2014, despite bearing the date of August 18, 2014, on the face of the agreement.

102. On October 19, 2014, Executive 4 sent himself a copy of the Termination Agreement, backdated to "18 of August 2014," that had been signed by Executive 4 and Intermediary 1. On October 22, 2014, Executive 4 asked Intermediary 1 to issue an invoice from Intermediary 1's New Company to the LCS Holding Company. Attached to the email was a copy of the signed Termination Agreement and a copy of the new consulting agreement between Lafarge Cement Holding and Intermediary 1's New Company, dated "[_] October, 2014" and signed by a LAFARGE representative and by Intermediary 1. Intermediary 1 responded on October 23, 2014, with an invoice for $210,000 which, in keeping with the scheme, represented payment for Intermediary 1's prior work as an intermediary between LAFARGE and ISIS.

103. LAFARGE paid the $210,000 invoice with a wire transfer from LAFARGE's operating account at a financial institution in Paris, through the Eastern District of New York, to intermediary banks in New York City, which transmitted the wire to Intermediary 1's New Company account at a financial institution in Dubai.

VIII. <u>LAFARGE Fails to Disclose its Involvement with ISIS and ANF to Holcim</u>

104. In early 2014, LAFARGE and Holcim, the two largest multinational building materials companies, began confidential discussions about the prospect of entering into a share-purchase agreement. Executive 6 led LAFARGE's team, while Holcim's was led by the then-Chairman of Holcim's Board of Directors. Eventually, on or about April 4, 2014, LAFARGE and Holcim announced that Holcim would acquire LAFARGE.

105. Before the announcement, Holcim and LAFARGE representatives met in March 2014 to exchange information about the material operations and known issues of the parties, such as public litigation and antitrust cases. LAFARGE's operations in Syria represented less than 1% of the LAFARGE Group's sales at the time the Jalabiyeh Plant was evacuated, and Holcim did not inquire specifically about LCS's operations in Syria. Holcim asked Executive 6 whether there were any undisclosed material or other important issues at LAFARGE that should be brought to the attention of Holcim before the transaction proceeded. Neither Executive 6 nor any other LAFARGE employee made any disclosures about LCS's operations in Syria. Holcim represents that if LAFARGE had disclosed the facts concerning LCS's agreements with ISIS and ANF in Syria, the Holcim directors who led the deal with LAFARGE would not have proceeded with the transaction.

IX. <u>LAFARGE's and LCS's Misconduct is Revealed</u>

106. On July 10, 2015, LAFARGE and Holcim completed the transaction, and LAFARGE became a wholly owned subsidiary of Holcim.

107. Following the acquisition, several LAFARGE and LCS executives were terminated or left their jobs, including Executive 2, Executive 5, Executive 6 and In-House Lawyer 1.

108. On February 19, 2016, a website run by an opposition group to the Syrian regime alleged that LAFARGE and LCS had purchased raw materials from and made other payments to ISIS. The report included partially redacted images of emails sent to and from LAFARGE and LCS executives' email accounts, discussing payments to ISIS.

109. Holcim's head of compliance learned of the Syrian website's allegations in February 2016, and after assessing them, informed Holcim's Chief Legal and Compliance Officer in April 2016. Holcim's Chief Legal and Compliance Officer engaged a U.S. law firm (the "U.S. law firm") to conduct a legal analysis of the allegations, which it presented on May 11, 2016. The same day, Holcim's Chief Legal and Compliance Officer informed the Finance & Audit Committee of Holcim's Board of Directors of the allegations and they directed him to conduct an investigation. In June 2016, additional law and professional services firms were retained to advise Holcim on the implications of French and Swiss law and to assist in data collection and processing, and in July 2016 the U.S. law firm was formally retained by the Finance & Audit Committee of Holcim's Board to conduct the investigation.

110. As part of the investigation, the U.S. law firm collected documents, electronic correspondence and other business records from Syria and France. The U.S. law firm also interviewed key employees and executives from Syria and France between January 11, 2017, and March 24, 2017. The U.S. law firm summarized its preliminary findings for the Board of Directors on February 28, 2017, and Holcim issued a corresponding press release on March 2, 2017. The U.S. law firm presented supplemental findings to Holcim's Board on April 4, 2017, and submitted a final report of its findings to the Board of Directors on April 17, 2017. On April 24, 2017, Holcim issued a press release announcing the conclusion of the investigation:

> The Board has now concluded the independent investigation and confirmed that a number of measures taken to continue safe operations at the Syrian plant were

49

unacceptable, and significant errors of judgement were made that contravened the applicable code of conduct. The findings also confirm that, although these measures were instigated by local and regional management, selected members of Group management were aware of circumstances indicating that violations of Lafarge's established standards of business conduct had taken place. . . .

Holcim also publicly disclosed that payments were made to U.S.-designated terrorist groups:

The safety and security of LCS employees was of primary concern.

As the situation in Syria deteriorated in late 2011, the plant became increasingly subject to disruption by local armed groups. These groups periodically interfered with employee transportation to and from the plant, restricted access to necessary supplies, and harassed customers. To deal with these problems, LCS used intermediaries to avoid direct contact with these armed groups as there was concern that direct contact would create additional risk vis-à-vis the Syrian government or other armed groups.

Very simply, chaos reigned and it was the task of local management to ensure that the intermediaries did whatever was necessary to secure its supply chain and the free movement of its employees. As a result, notwithstanding any reservations they had regarding these intermediaries, LCS made and continued to make payments to such intermediaries in furtherance of operations. Having identified a mechanism for dealing with the challenges they faced, these methods were applied without regard to the identity of the groups involved.

Beginning in early 2013, terrorist groups designated by the US and the EU were expanding into the area, along with other non-designated militant groups. It was in this chaotic environment that LCS operated and tried to keep its doors open. LCS management believed it was serving the best interests of the company and its employees who depended on LCS salaries for their livelihood.

LCS management kept Lafarge SA well-informed of developments and security-related concerns through their appointed chain of authority.

Those responsible for the Syria operations appear to have acted in a manner they thought was in the best interests of the company and its employees and, based on their communication and consultation along that same chain, in the belief that their efforts were fully understood, supported, and appreciated by their senior management. In hindsight any misdeeds may seem clear. However the combination of the war zone chaos and the "can-do" approach to maintain operations in these circumstances may have caused those involved to seriously misjudge the situation and to neglect to focus sufficiently on the legal and reputational implications of their conduct.

111. The evidence obtained by the government during its investigation does not establish that LAFARGE or LCS, or any of their employees, shared or supported the terrorist ideologies or goals of ISIS, ANF or any other FTO. Rather, LAFARGE and LCS, through their executives and employees, agreed to make payments through intermediaries to armed groups, ultimately including ISIS and ANF to, among other things, protect LCS's employees and assets in Syria, obtain raw materials for cement production at the Jalabiyeh Cement Plant and achieve a competitive advantage over LAFARGE's competitors.

112. The evidence obtained by the government during its investigation reflects that the LAFARGE and LCS executives who participated in the offense conduct were located in France, Syria, Egypt, Jordan, Lebanon, Turkey and the United Arab Emirates at various times during their participation in the offense. The offense did not involve employees of LAFARGE, or its subsidiaries or business operations, based in the United States.

113. The evidence obtained by the government during its investigation reflects that the offense conduct ended in approximately October 2014, before Holcim completed its acquisition of LAFARGE, and did not involve Holcim's assets, employees or operations in any way.

114. LAFARGE and certain of its executives, in fact, failed to disclose LCS's dealings with ISIS and ANF to Holcim throughout discussions of the transaction and after completion of the deal. LCS had ceased producing cement in Syria by the time the transaction with Holcim was completed, and in the approximately seven months between the completion of the acquisition and the emergence of public allegations regarding the misconduct in Syria, Holcim did not conduct post-acquisition due diligence about LCS's operations in Syria.

115. Following the completion of the internal investigation, Holcim terminated all former LAFARGE and LCS employees still employed by Holcim who were found to have been

involved in or responsible for LAFARGE's and LCS's offense conduct, including Executive 1 and Executive 3.

116. LCS is no longer operational, and LAFARGE is presently an indirect subsidiary of Holcim subject to Holcim's global compliance program, which was enhanced based on the findings of the internal investigation report into LAFARGE's and LCS's offense conduct. Holcim's global compliance program today includes an Ethics, Integrity and Risk Committee, which reports to the Audit Committee of the Board and closely supervises the compliance function; a Resilience and Governance Team that reviews conditions in countries where Holcim operates to identify and respond to changes in local conditions; robust third-party due diligence and sanctions and export control screening processes; and a well-designed process for mergers and acquisitions due diligence.

117. Holcim's remediation efforts following the discovery of LAFARGE's and LCS's offense conduct have been significant, and LAFARGE's and LCS's willingness to accept responsibility for their crimes evidences a commitment to preventing such serious crimes from occurring again. Holcim has enhanced its due diligence procedures, policies and guidelines relating to acquisition activities, including implementing various checks and controls to ensure compliance with all applicable laws and regulations before and after any acquisition. Holcim has put in place an effective compliance program reasonably designed and implemented to detect and prevent any potential future criminal conduct like that committed by LAFARGE and LCS.